# UNITED STATES DISTRICT COURT

### EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| OLIN SCOTT ANDERSON,<br><br>    Plaintiff,<br><br>    v.<br><br>COMMISSIONER OF SOCIAL SECURITY,<br><br>    Defendant. | Case No. 1:16-cv-01434-SAB<br><br>ORDER DENYING PLAINTIFF'S SOCIAL SECURITY APPEAL<br><br>(ECF Nos. 19, 20, 22) |

## I.

## INTRODUCTION

Plaintiff Olin Scott Anderson ("Plaintiff") seeks judicial review of a final decision of the Commissioner of Social Security ("Commissioner" or "Defendant") denying his application for period of disability, disability benefits, and supplemental security income pursuant to the Social Security Act. The matter is currently before the Court on the parties' briefs, which were submitted, without oral argument, to Magistrate Judge Stanley A. Boone.[1]

Plaintiff suffers from status post cerebrovascular accident with residual left-sided weakness, chronic bronchitis and tobacco abuse, a history of right thoracotomy with decortications, and seizure disorder.[2] For the reasons set forth below, the Court finds that Plaintiff's Social Security appeal shall be denied.

---

[1] The parties have consented to the jurisdiction of the United States Magistrate Judge. (See ECF Nos. 9, 10.)

[2] Plaintiff does not challenge the ALJ's findings that his mental impairments do not restrict his ability to work, so the Court does not discuss them in this decision.

## II.

## FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff protectively filed a Title II application for a period of disability and disability benefits and a Title XVI application for supplemental security income on April 28, 2014, alleging disability beginning on July 5, 2013. (AR 201-216.) Plaintiff's application was initially denied on August 13, 2014, and denied upon reconsideration on January 2, 2015. (AR 75-126.) Plaintiff requested and received a hearing before Administrative Law Judge Sharon L. Madsen ("the ALJ"). Plaintiff, who was represented by counsel, appeared for a hearing on February 23, 2016. (AR 50-74.) On March 16, 2016, the ALJ found that Plaintiff was not disabled. (AR 31-44.) The Appeals Council denied Plaintiff's request for review on June 16, 2016. (AR 12-16.)

### A.     Hearing Testimony

Plaintiff testified at the February 23, 2016 hearing.

Plaintiff is divorced and he has a thirteen year old son who does not live with him. (AR 54, 65.) He is homeless and lives at a place called "the Village" that is part of the Poverello House. (AR 54-55.) He does not want to be living where he is and he wants to get his own place and live a normal life. (AR 64.) He is receiving general relief and food stamps. (AR 55.) He does not have a driver's license, so he takes the bus or walks places. (AR 55.) He has a GED and he has not had any vocational training. (AR 55.) He was in special education classes for two of the three years of middle school and then for two years in high school before he dropped out and went for his GED. (AR 67.)

He does not need any help showering or dressing. (AR 56.) For meals, he warms up a cup of noodles, goes to the Poverello House, or goes to the mission. (AR 56.) He is able to shop. (AR 56.) He does not do any social activities. (AR 56.) During a typical day, he gets up around 6:30 a.m., has a cup of coffee, and goes to the Poverello House. (AR 56.) He is supposed to be out of his shed from around 8:00 a.m. to 4:00 p.m., so during that time he goes to a TV room to watch TV for about an hour-and-a-half after breakfast and then again after lunch. (AR 56-57.) He also takes naps during the day. (AR 57.)

He worked at Grocer's Development Center, Fleming, and Unified Grocers. (AR 57.)

He worked in a warehouse as an order picker, as a hand stacker of boxes and totes, and loading trucks. (AR 57.) He did some of his work with a forklift, but the heaviest he lifted by hand was 80 pounds, which someone helped him put on a pallet. (AR 57.) In 2013, he worked for Prestige Printing Direct Mail, a printing shop, delivering their flyers to places and driving a simple truck or van. (AR 58.) The heaviest he had to lift there was 20 to 30 pounds. (AR 58.)

Plaintiff's stroke has caused him problems with his left side, such as holding cups. (AR 58.) He is right-handed. (AR 54.) If he holds something too long in his left hand, he will drop it because his hand spasms and opens up. (AR 58-59.) He also has a hard time picking up small things in his left hand, such as coins or a pen. (AR 63.) He does not have control over his left hand sometimes. (AR 64.) So he tries to put things in his right hand and pick things up with his right hand. (AR 59, 63-64.) The bottom of the left side of his left foot hurts when he walks, so he tries not to walk a lot. (AR 59.) However, his left leg does not drag. (AR 67.) He uses a cane for balance mainly when he goes out walking. (AR 59.) His residuals have stayed the same after the stroke in 2013 and another medical event in December 2014. (AR 60.)

His lung issues cause him to have really bad days depending on the weather, so sometimes he does not want to be outside because he gets short of breath. (AR 59-60.) He is on medications for that which help and he uses an inhaler. (AR 60, 62.)

He has not had any problems with his kidneys in the past couple of months. (AR 67.) He used to have to use the restroom a lot during the day and constantly at night. (AR 67.)

He has a history of shoulder and knee surgery. (AR 60.) His left shoulder keeps popping and it sometimes bothers him. (AR 60-61.) He had ACL and meniscus surgery on his right knee about five years ago and it bothers him when it is cold. (AR 61.) He had fusion surgery between the sixth and seventh discs in his neck about four years ago and sometimes he has really bad headaches. (AR 61.)

He takes Aspirin and Plavix for his heart. (AR 61-62.) He has sharp pain related to his heart issues on his left side below the shoulder and between the shoulder and the chest. (AR 67.) He has this pain two or three times a day for 5 to 10 minutes each time. (AR 67-68.) When the pain happens he sits there and tries to relax. (AR 68.) He knows it is going to happen because

his left side underneath his arm will tighten up. (AR 68.)

He had a seizure in November 2015, so he takes medication, Keppra, which makes the seizure symptoms go away. (AR 62.) He is in good shape regarding his seizures as long as he takes his medications. (AR 62.) He is scheduled to have an MRI in the next couple of months. (AR 62-63.)

He thinks he can lift and carry 5 to 10 pounds, stand for 30 minutes before having to sit down, and walk a couple blocks before having to sit down for a few minutes. (AR 63.) He tries not to climb stairs. (AR 63.) He does not have any problems with sitting. (AR 63.) He gets short of breath when he exerts himself, lifts ten pounds, walks around, and stands. (AR 66.) He thinks he can stand for 2 hours in an 8-hour day. (AR 66.) He cannot use his left hand when he is sitting because of strength and coordination issues. (AR 66-67.)

He volunteers at The Village one night a week for four hours doing security where he walks around and checks doors and checks to make sure everyone is okay. (AR 65-66.) There is no lifting involved with his volunteering. (AR 66.)

He has not used meth or alcohol since July 2015 when he was admitted to the hospital. (AR 64.) The meth use was a one-time thing and happened when he was thinking of suicide. (AR 64-65.)

A vocational expert, Thomas C. Dachelet, also testified at the hearing. (AR 69-73.)

**B.    ALJ Findings**

The ALJ made the following findings of fact and conclusions of law:

- Plaintiff meets the insured status requirements of the Social Security Act through December 31, 2018.

- Plaintiff has not engaged in substantial gainful activity since July 5, 2013, the alleged onset date.

- Plaintiff has the following severe impairments: status post cerebrovascular accident with residual left-sided weakness; chronic bronchitis and tobacco abuse; a history of right thoracotomy with decortication; and seizure disorder.

- Plaintiff does not have an impairment or combination of impairments that meets or

medically equals the severity of one of the listed impairments.

- Plaintiff has the residual functional capacity ("RFC") to lift and carry no more than 10 pounds, stand and walk 4 hours in an 8-hour workday, and sit 6-8 hours in an 8-hour workday. He requires a cane for ambulation. He is capable of occasionally balancing, kneeling, climbing, and crawling. He can frequently stoop and crouch. He is able to frequently handle, grip and grasp with his left upper extremities. He is precluded from climbing ladders, ropes, or scaffolds, working at heights, working around dangerous machinery, or driving. He should avoid concentrated exposure to dust, gases, or fumes.

- Plaintiff is unable to perform any past relevant work.

- Plaintiff was born on February 26, 1968, and was 45 years old, which is defined as a younger individual age 18-44, on the alleged disability onset date.

- Plaintiff has at least a high school education and is able to communicate in English.

- Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that he is "not disabled," whether or not he has transferable job skills.

- Considering Plaintiff's age, education, work experience, and RFC, there are jobs that exist in significant numbers in the national economy that Plaintiff can perform.

- Plaintiff has not been under a disability, as defined in the Social Security Act, from July 5, 2013, through the date of this decision.

(AR 33-44.)

### III.

### LEGAL STANDARD

To qualify for disability insurance benefits under the Social Security Act, the claimant must show that he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The Social Security Regulations set out a five step

sequential evaluation process to be used in determining if a claimant is disabled. 20 C.F.R. § 404.1520; Batson v. Commissioner of Social Security Administration, 359 F.3d 1190, 1194 (9th Cir. 2004). The five steps in the sequential evaluation in assessing whether the claimant is disabled are:

> Step one: Is the claimant presently engaged in substantial gainful activity? If so, the claimant is not disabled. If not, proceed to step two.
>
> Step two: Is the claimant's alleged impairment sufficiently severe to limit his or her ability to work? If so, proceed to step three. If not, the claimant is not disabled.
>
> Step three: Does the claimant's impairment, or combination of impairments, meet or equal an impairment listed in 20 C.F.R., pt. 404, subpt. P, app. 1? If so, the claimant is disabled. If not, proceed to step four.
>
> Step four: Does the claimant possess the residual functional capacity ("RFC") to perform his or her past relevant work? If so, the claimant is not disabled. If not, proceed to step five.
>
> Step five: Does the claimant's RFC, when considered with the claimant's age, education, and work experience, allow him or her to adjust to other work that exists in significant numbers in the national economy? If so, the claimant is not disabled. If not, the claimant is disabled.

Stout v. Commissioner, Social Sec. Admin., 454 F.3d 1050, 1052 (9th Cir. 2006).

Congress has provided that an individual may obtain judicial review of any final decision of the Commissioner of Social Security regarding entitlement to benefits. 42 U.S.C. § 405(g). In reviewing findings of fact in respect to the denial of benefits, this court "reviews the Commissioner's final decision for substantial evidence, and the Commissioner's decision will be disturbed only if it is not supported by substantial evidence or is based on legal error." Hill v. Astrue, 698 F.3d 1153, 1158 (9th Cir. 2012). "Substantial evidence" means more than a scintilla, but less than a preponderance. Smolen v. Chater, 80 F.3d 1273, 1279 (9th Cir. 1996) (internal quotations and citations omitted). "Substantial evidence is relevant evidence which, considering the record as a whole, a reasonable person might accept as adequate to support a conclusion." Thomas v. Barnhart, 278 F.3d 947, 955 (9th Cir. 2002) (quoting Flaten v. Sec'y of Health & Human Servs., 44 F.3d 1453, 1457 (9th Cir. 1995)).

"[A] reviewing court must consider the entire record as a whole and may not affirm simply by isolating a specific quantum of supporting evidence." Hill, 698 F.3d at 1159 (quoting

6

Robbins v. Social Security Administration, 466 F.3d 880, 882 (9th Cir. 2006)). However, it is not this Court's function to second guess the ALJ's conclusions and substitute the court's judgment for the ALJ's. See Burch v. Barnhart, 400 F.3d 676, 679 (9th Cir. 2005) ("Where evidence is susceptible to more than one rational interpretation, it is the ALJ's conclusion that must be upheld.").

## IV.

## DISCUSSION AND ANALYSIS

Plaintiff argues that the ALJ erred because the ALJ failed to give legally adequate reasons for rejecting the opinion of his treating physician, Dr. Michael Lynch, and the ALJ failed to properly consider Plaintiff's testimony.[3]   Defendant counters that substantial evidence supports the ALJ's decision to assign little weight to Dr. Lynch's opinion and the ALJ's findings regarding Plaintiff's credibility.

### A.      Dr. Lynch's Opinion

Plaintiff argues that the ALJ erred in rejecting the opinion of Dr. Lynch. In response, Defendant argues that the ALJ properly did not assign significant weight to Dr. Lynch's opinion because Dr. Lynch's opinion addressed issues reserved to the Commissioner and was internally inconsistent.

The weight to be given to medical opinions depends upon whether the opinion is proffered by a treating, examining, or non-examining professional. See Lester v. Chater, 81 F.3d 821, 830-831 (9th Cir. 1995). In general a treating physician's opinion is entitled to greater weight than that of a nontreating physician because "he is employed to cure and has a greater opportunity to know and observe the patient as an individual." Andrews v. Shalala, 53 F.3d 1035, 1040-41 (9th Cir. 1995) (citations omitted). If a treating physician's opinion is contradicted by another doctor, it may be rejected only for "specific and legitimate reasons" supported by substantial evidence in the record. Ryan v. Commissioner of Social Sec., 528 F.3d

---

[3] Plaintiff also argues that remand for payment of benefits is the appropriate remedy in this case. However, as the Court affirms the ALJ's decision, the Court does not address the argument regarding remand for payment of benefits.

1  1194, 1198 (9th Cir. 2008) (quoting <u>Bayless v. Barnhart</u>, 427 F.3d 1121, 1216 (9th Cir. 2005)).

2  Where the treating physician's opinion is contradicted by the opinion of an examining
3  physician who based the opinion upon independent clinical findings that differ from those of the
4  treating physician, the nontreating source itself may be substantial evidence, and the ALJ is to
5  resolve the conflict. <u>Andrews</u>, 53 F.3d at 1041. However, if the nontreating physician's opinion
6  is based upon clinical findings considered by the treating physician, the ALJ must give specific
7  and legitimate reasons for rejecting the treating physician's opinion that are based on substantial
8  evidence in the record. <u>Id.</u>

9  "The ALJ can meet this burden by setting out a detailed and thorough summary of the
10  facts and conflicting clinical evidence, stating his interpretation thereof, and making findings."
11  <u>Magallanes v. Bowen</u>, 881 F.2d 747, 751 (9th Cir. 1989) (quoting <u>Cotton v. Bowen</u>, 779 F2d
12  1403, 1408 (9th Cir. 1989)).

13  The ALJ considered that Dr. Lynch opined in September 2014 that Plaintiff had
14  limitations since July 2013, including that Plaintiff could only occasionally lift and carry up to 5
15  pounds, rarely lift and carry up to 15 pounds, and never lift and carry 20 pounds or more. (AR
16  37-38, 842-849.) Dr. Lynch opined that Plaintiff must be permitted to lie down and recline for 1
17  hour during each 8-hour workday because of leg weakness and fatigue. (<u>Id.</u>) He found that
18  Plaintiff could sit and stand for 2 hours each in an 8-hour workday. (<u>Id.</u>) Plaintiff must be
19  permitted to take 15 minute unscheduled breaks every 1.5 to 2 hours and should avoid prolonged
20  ambulation. (<u>Id.</u>) Plaintiff is limited to using for his non-dominant left hand to grasp, turn, and
21  twist objects 30% of an 8-hour workday, his left fingers for fine manipulation 30% of an 8-hour
22  workday, and left arm for reaching 30% of an 8-hour workday. (<u>Id.</u>) He cannot climb ladders,
23  scaffolds, and ropes. (<u>Id.</u>) He suffers from depression, which might contribute to the severity of
24  his physical problems. (<u>Id.</u>) He has occasional low back pain which was severe enough to
25  interfere with his attention and concentration. (<u>Id.</u>) He would be off task approximately 10% of
26  an 8-hour workday and he would miss one workday or less each month. Dr. Lynch estimated
27  that Plaintiff could perform a job at 90% on a sustained basis and he stated that Plaintiff needed a
28  job that fit his capacity. (<u>Id.</u>)

Here, the ALJ only gave some weight to the opinion of Dr. Lynch. The ALJ found:

> Whether a claimant is able to work is an issue reserved to the Commissioner, pursuant to SSR 96-5p. Moreover, his opinion is internally inconsistent. Dr. Lynch initially opined the claimant's impairments prevented him from working; yet he concluded by stating the claimant needed a job that fit his capacity.

(AR 38.)

While the ALJ must consider all medical evidence, "[t]he treating physician's opinion is not . . . necessarily conclusive as to either a physical condition or the ultimate issue of disability." Magallanes, 881 F.2d at 751. However, the ALJ may not simply reject the treating physician's opinion on the ultimate issue of disability. Ghanim v. Colvin, 763 F.3d 1154, 1154 (9th Cir. 2014). To reject the contradicted opinion of the treating physician, the ALJ must provide specific and legitimate reasons that are supported by substantial evidence. Id. Here, Dr. Lynch's opinion contains specific limitations and is not just an opinion on the ultimate issue of disability. Even if a part of Dr. Lynch's opinion is on a matter reserved for the Commissioner, that is in itself not a specific and legitimate reason to reject the opinion. See Ghanim, 763 F.3d at 1161. The Court reviews the other reason to determine whether the ALJ provided a specific and legitimate reason supported by substantial evidence for rejecting Dr. Lynch's opinion.

The other reason that the ALJ provided for rejecting Dr. Lynch's opinion is that it is internally inconsistent. Plaintiff did not specifically address this reason in his opening brief, except for stating that this was a reason the ALJ gave for rejecting Dr. Lynch's opinion. Defendant argues that the ALJ properly rejected Dr. Lynch's opinion for being inconsistent because there was an obvious inconsistency in Dr. Lynch's opinion—if one could work only four hours per day, he could not work eight hours per day. Dr. Lynch answered "no" to question 20 which asked whether Plaintiff is "unable to obtain and retain work in a competitive work environment, 8 hours per day, 5 days per week for a continuous period of six months or more." (AR 848.) However, Dr. Lynch also wrote that Plaintiff could stand and walk for only two hours and sit only two hours per day in an 8-hour work day. (AR 844-845.) In his reply brief, Plaintiff asserts that the ALJ and the Commissioner now focus on the poorly phrased question 20 on a medical source statement form. Plaintiff contends that question 20 is a bad question for which

Dr. Lynch gave a bad answer and that "the author of the form confused himself and anyone reading in using the form." (ECF No. 22 at 5.) Plaintiff argues that "[t]he only reasonable reading of the form and its complicated multiple parenthetical expressions is that Dr. Lynch meant, 'no, [Plaintiff] cannot work full time.' " (AR 22 at 5-6.)

The Ninth Circuit has held that inconsistencies in a physician's report are relevant evidence. The Ninth Circuit has also determined that it is an ALJ's responsibility to resolve ambiguity and conflicts in medical testimony and that "[d]etermining whether inconsistencies are material (or are in fact inconsistencies at all) and whether certain factors are relevant to discount the opinions of [physicians] falls within this responsibility." Morgan v. Comm'r of Soc. Sec. Admin., 169 F.3d 595, 603 (9th Cir. 1999) (citing Andrews, 53 F.3d at 1041; Magallanes, 881 F.2d at 751, 755).

Here, the Court finds that the ALJ's interpretation is rational. Question 20 clearly states "[d]o you believe, within a reasonable degree of medical certainty, that you patient, because of his/her medical impairments and physical and/or mental limitations, is unable to obtain and retain work in a competitive work environment, 8 hours per day, 5 days per week for a continuous period of six months or more." (AR 848-849.) Dr. Lynch checked no in response to this question. (Id.) Therefore, Dr. Lynch opined that Plaintiff was able to obtain and retain work in a competitive work environment, 8 hours per day, 5 days per week. This is inconsistent with Dr. Lynch's opinion that Plaintiff could stand and walk for only two hours and sit for only two hours in an 8-hour workday. (AR 844-845.) Although Plaintiff offers a different interpretation of the evidence, where the ALJ's interpretation is rational, it is not this Court's function to second guess the ALJ's conclusions and substitute the Court's judgment for the ALJ's. See Burch, 400 F.3d at 679. Therefore, the Court finds that the ALJ provided a specific and legitimate reason to reject Dr. Lynch's opinion that is supported by substantial evidence in the record.[4] Accordingly, the Court finds that the ALJ did not err in only giving some weight to Dr.

---

[4] Additionally, the ALJ gave greater weight to the opinion of Dr. Tanya Warwick, the consultative neurologist who saw Plaintiff on July 19, 2014, because she performed a thorough, well-documented examination of Plaintiff and she is Board-certified in neurology. (AR 39-40, 839-841.) Dr. Warwick opined that Plaintiff could stand and walk for 6 hours in an 8-hour workday, sit without restrictions, and lift and carry 20 pounds occasionally and 10 pounds frequently. (AR 40, 841.) Dr. Warwick also opined that Plaintiff had manipulative limitations with his left upper

1  Lynch's opinion.[5]

2  **B.   Plaintiff's Credibility**

3       Plaintiff argues that the ALJ erred in finding Plaintiff's subjective complaints to be only

4  partially credible.  Defendant also argues that the ALJ properly only gave some weight to

5  Plaintiff's testimony because of Plaintiff's statement in July 2014 that he was going to look for

6  work, inconsistent statements about the use of drugs and alcohol, and the objective evidence did

7  not support Plaintiff's allegations of disability.

8       "An ALJ is not required to believe every allegation of disabling pain or other non-

9  exertional impairment."  Orn v. Astrue, 495 F.3d 625, 635 (9th Cir. 2007) (internal punctuation

10  and citations omitted).  Determining whether a claimant's testimony regarding subjective pain or

11  symptoms is credible, requires the ALJ to engage in a two-step analysis.  Molina v. Astrue, 674

12  F.3d 1104, 1112 (9th Cir. 2012).  The ALJ must first determine if "the claimant has presented

13  objective medical evidence of an underlying impairment which could reasonably be expected to

14  produce the pain or other symptoms alleged."  Lingenfelter v. Astrue, 504 F.3d 1028, 1036 (9th

15  Cir. 2007) (internal punctuation and citations omitted).  This does not require the claimant to

16  show that his impairment could be expected to cause the severity of the symptoms that are

17  alleged, but only that it reasonably could have caused some degree of symptoms.  Smolen, 80

18  F.3d at 1282.

19       Then "the ALJ may reject the claimant's testimony about the severity of those symptoms

20

21  extremity and could frequently climb, balance, stoop, kneel, crawl, and crouch.  (AR 40, 841.)  Plaintiff had grip
   strength of 100-95-90 on the right and 80-75-60 on the left and decreased sensation throughout the whole left side to

22  soft touch.  (AR 39, 840.)  Dr. Warwick found that Plaintiff had poor effort on the left with some giveaway
   weakness, but he obtained 4/5 strength on the left upper and lower extremities.  (AR 39, 840.)  Further, Dr. K.

23  Mohan, a State agency reviewing physician, opined in August 2014 that Plaintiff could lift and carry up to 20
   pounds occasionally and 10 pounds frequently, sit 6 hours in an 8-hour workday, stand and walk 6 hours in an 8-

24  hour workday, and frequent reaching, handling, fingering, and feeling with the left hand.  (AR 40, 92-94.)  Dr.
   Mohan also opined that Plaintiff could frequently climb, balance, stoop, kneel, crouch, and crawl, as well as some

25  environmental limitations.  (AR 40, 81-83, 93-94.)  This opinion was adopted by Dr. A. Nasrabadi, another State
   agency reviewing physician, at the reconsideration level, except Dr. Nasrabadi found that Plaintiff was unlimited in

26  reaching.  (AR 40, 107-109, 120-122.)

27  [5] Since the ALJ provided a specific and legitimate reason to reject the opinion of Dr. Lynch, any error in the other
   reason given for discounting Dr. Lynch's opinion was harmless.  Valentine v. Comm'r Soc. Sec. Admin., 574 F.3d

28  685, 694 (9th Cir. 2009).

only by providing specific, clear, and convincing reasons for doing so." Brown-Hunter v. Colvin, 806 F.3d 487, 488–89 (9th Cir. 2015). "The ALJ must specifically make findings that support this conclusion and the findings must be sufficiently specific to allow a reviewing court to conclude the ALJ rejected the claimant's testimony on permissible grounds and did not arbitrarily discredit the claimant's testimony." Moisa v. Barnhart, 367 F.3d 882, 885 (9th Cir. 2004) (internal punctuation and citations omitted). Factors that may be considered in assessing a claimant's subjective pain and symptom testimony include the claimant's daily activities; the location, duration, intensity and frequency of the pain or symptoms; factors that cause or aggravate the symptoms; the type, dosage, effectiveness or side effects of any medication; other measures or treatment used for relief; functional restrictions; and other relevant factors. Lingenfelter, at 1040; Thomas, 278 F.3d at 958. In assessing the claimant's credibility, the ALJ may also consider "ordinary techniques of credibility evaluation, such as the claimant's reputation for lying, prior inconsistent statements concerning the symptoms, and other testimony by the claimant that appears less than candid." Tommasetti v. Astrue, 533 F.3d 1035, 1039 (9th Cir. 2008) (quoting Smolen, 80 F.3d at 1284). The district court is constrained to review those reasons that the ALJ provided in finding the claimant's testimony not credible. Brown-Hunter, 806 F.3d at 492.

Here, the ALJ found Plaintiff partially credible and found that Plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms, but Plaintiff's statements regarding the intensity, persistence, and limiting effects of the symptoms were not entirely credible for the reasons explained in the decision. (AR 41-42.)

1.    Looking For a Job

The first reason that the ALJ gave for discrediting Plaintiff is that Plaintiff told his primary care physician in July 2014 that he was going to look for a job so he could leave his father's home. (AR 41.) The ALJ found that this suggested that Plaintiff was not as disabled as he alleged. (AR 41.)

Plaintiff argues that it is impermissible for an ALJ to discount a plaintiff's credibility because of his desire to engage in a trial work period and desire to attempt to maintain some

semblance of normalcy in his life.  Defendant, citing <u>Bray v. Comm'r of Soc. Sec.</u>, 554 F.3d 1219, 1227 (9th Cir. 2009), argues that an ALJ can properly use the fact that a plaintiff has worked or looked for work after the alleged onset date of disability as a basis for rejecting the plaintiff's allegations of disabling impairments.  In <u>Bray</u>, the Ninth Circuit found that it was proper for the ALJ to reject a plaintiff's credibility when she recently worked as a personal caregiver for two years and sought out other employment since then.  <u>Id.</u>  In his reply, Plaintiff contends that the desire to work does not defeat the claim for disability where the desire to work exists within the alleged limitations.  Plaintiff asserts that there is no evidence suggesting that he was attempting to look for work beyond the limitations he described.

On July 31, 2014, Dr. Lynch stated that, "HE IS GOING TO LOOK FOR EMPLOYMENT ONCE HE HAS THE SOURCE OF LIVING OUTSIDE HIS FATHER'S HOME."  (AR 875.)  Plaintiff testified that he could stand for 30 minutes, walk for a couple of blocks before needing to rest, walk with the use of cane, and lift and carry 5-10 pounds, but he has problems picking things up and holding things in his left hand.  (AR 41, 58-59, 63-64.)  While Plaintiff expressed that he was going to look for employment, this is not necessarily inconsistent with his allegations of disabling limitations.  It is unclear if Plaintiff was going to seek employment that was consistent with his claimed limitations.  Therefore, the Court finds that Plaintiff's statement that he was going to look for a job is not a clear and convincing reason for finding Plaintiff only partially credible.

### 2.  Inconsistent Statements Regarding Drug and Alcohol Use

Plaintiff argues that his statement in November 2015 that he had used methamphetamine "a while ago" is consistent with his testimony at the hearing that the methamphetamine usage was while he was contemplating suicide in July 2015.[6]  Defendant counters that the ALJ reasonably found that Plaintiff's effort to minimize his methamphetamine use by characterizing it as "a while ago" even though it happened at the same time as his drinking "a few months" earlier undermined his other allegations.  Defendant contends that the ALJ considered Plaintiff's

---

[6] Plaintiff points out that he did use methamphetamine in July 2015 when he was brought to the emergency department on a 5150 by the police.

assertion that his July 2015 methamphetamine use related to his suicidal ideation. Defendant asserts that it does not change the fact that Plaintiff's characterization of his methamphetamine use as a "while ago" while describing contemporaneous alcohol use as "a few months" earlier minimized his methamphetamine use and was inconsistent with his other admissions. In his reply, Plaintiff argues that the ALJ does not explain how the statement in November 2015 of "a while ago" is inconsistent with the statement at the hearing identifying July 2015 as the last usage of methamphetamine.

The ALJ stated that Plaintiff testified that he had not used methamphetamine since July (2015), and he was not drinking alcohol. (AR 41, 64-65.) The ALJ noted that Plaintiff reported in November 2015 that he had last had a drink a few months earlier and used methamphetamine "a while ago." (AR 41, 1163.) The ALJ found that Plaintiff's credibility was undermined because he has reported varying dates regarding the use of drugs and alcohol. (AR 41.)

In assessing a claimant's credibility, the ALJ is entitled to use "ordinary techniques of credibility evaluation, such as a claimant's reputation for truthfulness and any inconsistent statements in [his] testimony." Tonapetyan, 242 F.3d at 1148.

On July 23, 2013, Plaintiff stated that he has smoked one pack a day for the last 20 years and he used to drink alcohol and abuse pain killers, but he quit 2 years ago. (AR 325.) On July 24, 2013, Plaintiff admitted to methamphetamine abuse in the past. (AR 323.) On July 26, 2013, he reported that he is a former alcoholic and has not been drinking recently, and the report states that according to records, he also has used IV methamphetamine in the past, but none recently. (AR 386.)

On August 12, 2013, when he was admitted to St. Agnes Medical Center Fresno ("St. Agnes"), he stated that he drank alcohol 2 to 4 times per month, he has 8 or more drinks weekly, and he has 5 or 6 drinks in a day. (AR 609.) On August 14, 2013, Plaintiff denied alcohol use and drug use. (AR 533.)

On November 19, 2013, Plaintiff stated that he stopped drinking alcohol about 2 years prior. (AR 668.) On November 20, 2013, a report indicates that Plaintiff quit drinking 2 years ago and that there is a remote history of alcohol use which may have been by Plaintiff's

admission excessive.  (AR 670.)

On November 12, 2014, Dr. Lynch indicated that Plaintiff has not been drinking alcohol for 3 years.  (AR 857.)  On December 1, 2014, Plaintiff denied alcohol use.  (AR 972.)  Plaintiff told consultative psychologist Steven Swanson on December 23, 2014, that he had a history of pain pill addiction and alcoholism, but he said he stopped drinking in 2011.  (AR 892.)  He also mentioned that he takes Xanax multiple times daily and that he has smoked cigarettes and marijuana for a long time.  (AR 892.)

On June 15, 2015, while Plaintiff was at St. Agnes for emergency care after ingesting a handful of his pills, he reported that he had a few beers recently, but then denied alcohol use to another medical provider at the hospital on the same day.  (AR 902, 909.)

Plaintiff reported that he was kicked out of a room and board facility in June 2015 because a drug test was positive for methamphetamine.  (AR 1057, 1059.)

When Plaintiff was admitted to Community Regional Medical Center ("CRMC") under an involuntary psychiatric hold on July 6, 2015, he tested positive for methamphetamine.  (AR 1062, 1070, 1081, 1105.)  The July 6, 2015 emergency department note states that Plaintiff initially admitted to "amphetamine" use per emergency medical services ("EMS"), but then he denied.  (AR 1271.)  Plaintiff reports "amphetamine use," but last use was "2 weeks ago."  (AR 1271.)  On July 6, 2015, Plaintiff also reported that he quit using alcohol three years ago.  (AR 1266.)  On July 8, 2015, it was noted that Plaintiff has a history of methamphetamine use, but he used for the first time in twelve years on July 4, 2015.  (AR 34, 1065.)  On July 8, 2015, Plaintiff stated that he has 2-3 beers a day.  (AR 1065.)

On July 11, 2015, he reported decreased alcohol use and decreased methamphetamine use.  (AR 1055.)  During a psychiatric evaluation on July 11, 2015, it is noted that "[h]e said that he started using methamphetamine for a few months."  (AR 1057.)

On July 13, 2015, Plaintiff reported that he last used methamphetamine a few days earlier and that he drank alcohol once a week.  (AR 1058, 1060.)

On July 17, 2015, while Plaintiff was at CRMC, he admitted to using methamphetamine.  (AR 1055.)  Plaintiff also reported smoking, decreased use of alcohol, and decreased use of

methamphetamine.  (AR 1055.)

When Plaintiff was admitted to CRMC on September 21, 2015, he stated that he occasionally used alcohol and that he quit marijuana and methamphetamine three years ago. (AR 1223.)  On September 22, 2015, Plaintiff stated that his last use of methamphetamine was several weeks ago.  (AR 1227.)  On September 24, 2015, one of the discharge diagnoses was methamphetamine abuse and it states that that diagnosis was present on admission.  (AR 1211, 1214.)

From November 3, 2015, to November 14, 2015, Plaintiff was hospitalized at CRMC because of a seizure and while in the hospital he indicated that he last had a drink a "few" months ago, but his last methamphetamine use was "a while ago."  (AR 1163.)  He denied any recent illicit drug or alcohol use.  (AR 1163.)

On November 20, 2015, Plaintiff was admitted to CRMC for shortness of breath and stated that he had no history of illicit drug use.  (AR 1137.)  On November 21, 2015, he indicated that he did not use alcohol, but then there is a comment in the report of occasional use.  (AR 1126.)  He also indicated no drug use and that he quit 3 years ago.  (AR 1126.)

Plaintiff's statement in November 2015 that he had not had a drink in a few months and last used methamphetamine a while ago is inconsistent and undermines his testimony when, according to Plaintiff's hearing testimony, he both drank and used methamphetamine in July 2015.  Plaintiff characterized his alcohol and methamphetamine use as though they occurred at vastly different times when they both occurred in the same month according to the hearing testimony.

In addition, as detailed above, Plaintiff gave varying dates regarding his use of alcohol and methamphetamine throughout the record.  Although Plaintiff testified at the hearing that he had not used methamphetamine since July 2015 when he was admitted to the hospital because he was suicidal and that it was a one-time thing, the record reflects that Plaintiff has reported varying dates regarding his use of methamphetamine, including use after that July 2015 hospitalization.  (AR 64-65, 323, 325, 386, 892, 1055, 1057-1060, 1062, 1065, 1070, 1081, 1105, 1126, 1137, 1211, 1214, 1223, 1227, 1271.)  Plaintiff has also reported varying dates for

the use of alcohol.  (AR 386, 533, 609, 668, 670, 857, 892, 902, 909, 972, 1055, 1058, 1060, 1065, 1126, 1163, 1223, 1266.)

Plaintiff citing Trevizo v. Berryhill, 871 F.3d 664 (9th Cir. 2017), argues that the ALJ should have developed the record based on any perceived inconsistency between reported activities or history and the testimony adduced at the hearing.  In Trevizo, the Ninth Circuit found that "there is almost no information in the record about Trevizo's childcare activities; the mere fact that she cares for small children does not constitute an adequately specific conflict with her reported limitations."  871 F.3d at 682.  However, the instant case is distinguishable from Trevizo, because the information in the record regarding Plaintiff's drug and alcohol use shows that he has reported varying dates, which undermines his credibility.  There was no need for the ALJ to obtain further information about Plaintiff's drug and alcohol use in order to find his statements inconsistent.

Therefore, the Court finds that the ALJ's finding that Plaintiff made inconsistent statements regarding the dates of his drug and alcohol use is supported by substantial evidence in the record.

### 3. Good Recovery From Stroke

Plaintiff states in his opening brief the ALJ's finding that "[a]lthough Plaintiff had a stroke, he has made a good recovery.  There is a slight residual left-sided weakness, but that has been factored into the residual functional capacity."  (ECF No. 19 at 18.)[7]  Plaintiff asserts that the medical evidence is not the only evidence that the ALJ is required to assess and then cites to factors that an ALJ should consider in assessing a plaintiff's credibility.[8]  Defendant counters that although Plaintiff attributed his alleged disability mostly to his stroke, the record showed that Plaintiff recovered well from his stroke, with some weakness on his left side but no other lasting neurological abnormalities.  Defendant points out that the ALJ accounted for the mild

---

[7] All references to pagination of specific documents pertain to those as indicated on the upper right corners via the CM/ECF electronic court docketing system.

[8] Plaintiff focuses his arguments on not being able to grip or grasp items with his left hand due to spasms following his stroke, which affected the left side of his body.  See ECF No. 19 at 18:15-16.  Therefore, the Court only addresses the objective medical evidence relating to Plaintiff's stroke, and not his seizures, cervical radiculopathy, and heart valve problems.

left-sided weakness by precluding Plaintiff from constant use of his left hand.  (AR 37, 42.)
Plaintiff did not address this reason in his reply.

The determination that a claimant's complaints are inconsistent with clinical evaluations can satisfy the requirement of stating a clear and convincing reason for discrediting the claimant's testimony.  Regennitter v. Commissioner of Social Sec. Admin., 166 F.3d 1294, 1297 9th Cir. 1999).  "While subjective pain testimony cannot be rejected on the sole ground that it is not fully corroborated by objective medical evidence, the medical evidence is still a relevant factor in determining the severity of the claimant's pain and its disabling effects."  Rollins v. Massanari, 261 F.3d 853, 857 (9th Cir. 2001) (citing 20 C.F.R. § 404.1529(c)(2)).

On July 5, 2013, during a physical examination at CRMC, Plaintiff had 4/5 strength on his left side, was impaired doing the finger to nose test on his left side, and had mildly slurred speech.  (AR 307.)  During a neurology consultation on July 6, 2013, he was 4/5 in proximal and distal muscle groups in his left arms and legs.  (AR 312-313.)  He had deep tendon reflexes 1+ , intact light touch, but finger-to-nose test was difficult on his left side.  (AR 313.)  He was discharged in stable condition on July 7, 2013.  (AR 314-315.)

On July 20, 2013, while Plaintiff was at CRMC related to chest and abdominal pain, he had no dizziness, numbness, or weakness.  (AR 320.)

On August 29, 2013, during a nephrology follow-up, Plaintiff had normal motor strength, sensory, and coordination.  (AR 835.)

On November 20, 2013, Plaintiff saw Dr. Kurt V. Miller for an evaluation of a stroke, who found that Plaintiff's station and gait are stable and smooth, normal bulk in upper and lower extremities, increased tone in the left upper extremity with a tremor, and posturing of the left hand, which was noted as essentially spasticity of the hand with some posturing.  (AR 670.)  He had odd sensation in the hand and "he has difficulty ___, and coordination is clumsy on the left hand."  (AR 670-671.)

On November 26, 2013, Dr. Lynch found that Plaintiff has weakness in the extensors of the third and fourth fingers of his left hand after the stroke.  (AR 774.)  On December 23, 2013, Dr. Lynch noted that Plaintiff had residual weakness of the third, fourth, and fifth extensors after

his November 2013 cerebrovascular accident.  (AR 770.)  On March 7, 2014, Dr. Lynch noted that Plaintiff has paresthesias of the arms and hands and left greater than right.  (AR 762.)

On July 19, 2014, during a neurologic consultative examination with Dr. Warwick, Plaintiff had 5/5 strength throughout the right side, and poor effort on the left with some giveaway weakness, but he still obtained 4/5 strength on the left side.  (AR 840.)  He had decreased sensation throughout the whole left side to soft touch and was somewhat slow cognitively, but had 2+ reflexes, normal gait, and an intact finger-to-nose test.  (AR 840-841.)

On October 4, 2014, when Plaintiff went to St. Agnes for a problem with diarrhea, he had normal range of motion and strength, normal motor and speech, no focal neurological deficit, steady gait when ambulating, and mobility within norm.  (AR 886, 1029.)

On November 26, 2014, Plaintiff went to St. Agnes because of left hand cramping and it was noted that Plaintiff had "[o]dd, Dystonic like, nonsterotypical [*sic*] movement of left hand." (AR 1001-1021.)  He had a CT scan of his head which revealed an old right frontoparietal infarct with associated atrophy, but no acute findings.  (AR 1019.)  He was discharged that day.  (AR 1016.)

On December 1, 2014, Plaintiff was brought to St. Agnes because he was found by a neighbor on the floor next to his bed and the physical examination revealed normal musculoskeletal strength with no tenderness or swelling, but the neurological exam revealed weakness in the left arm that is worse than right.  (AR 968-972.)  He had a CT scan on December 1, 2014, which was negative for acute intracranial process, but revealed an old right MCA territory infarct and issues with the sinuses involving the bilateral ethmoid and maxillary sinuses. (AR 981.)  Plaintiff was admitted to St. Agnes on December 2, 2014, because he had right[9] hand dystonia with spasm that was going on for over 6 weeks and an altered mental status.  (AR 937-947.)

During a neurologic consultation with Dr. Abbas Mehdi on December 2, 2014, Plaintiff denied any symptoms in his lower extremities and right upper extremity.  (AR 955.)  "The motor

---

[9] It appears that the correct finding may be dystonia with spasm in the left hand and not the right.

examination on [Plaintiff] was limited simply because of lack of [Plaintiff's] cooperation." (AR 955.) Left upper extremity showed some degree of loss of dexterity of the hand, but Plaintiff was able to make a reasonably good grip and there was a mild pronator drift. (AR 955.) Dr. Mehdi found that motor findings showed minimal to mild weakness of the left upper extremity. (AR 955.) Dr. Mehdi also noted that "[t]he sensory examination on [Plaintiff] shows some restriction and lack of patient cooperation, which limits the reliability but he clearly was able to localize quite well in all 4 limbs." (AR 955-956.) Plaintiff complained of dizziness, but there was no sign of cerebellar ataxia on exam and no significant gait problem. (AR 956.) Dr. Mehdi found that "[Plaintiff's] neurological exam today does not show any significant positive findings, and [Plaintiff] states his symptoms have resolved." (AR 956.)

A December 3, 2014 progress note indicates that Plaintiff had 3/5 strength in his left hand, mild left hand clumsiness, positive mild ataxic movement with the finger-to-nose test and heel-to-shin test on his left side. (AR 952.) Another progress note indicates that Plaintiff's left hand has minimal to mild weakness at least 4/5 and there is clumsiness not ataxia. (AR 953.) "[Plaintiff's] exam has limitations due to suboptimal efforts and symptom magnification, possibly secondary gain." (AR 953.) An MRI of the brain on December 3, 2014, indicated no new infarction, remote right MCA infarction, bilateral cataract surgery, and minimal mucosal sinus disease. (AR 983.) He was discharged from the hospital on December 4, 2014. (AR 937-947.)

During a December 23, 2014 psychiatric consultative examination, Steven Swansen, Ph. D., noted that there was nothing atypical in Plaintiff's gait or postural presentation and he ambulated independently to the session unaccompanied. (AR 893.) Plaintiff had an average amount of motor movement with no marked idiosyncrasies. (AR 893.)

On February 2, 2015, he went to St. Agnes because he was out of medication for three days and he was having muscle contractions and anxiety, and he stated that he had left arm weakness and shortness of breath since the anxiety started. (AR 922, 924, 932.) It was noted that he was having mild left hand contractures and spasms. (AR 933.)

On April 2, 2015, Plaintiff saw Dr. Than Aw to establish care and Dr. Aw noted that

Plaintiff had no assistive device, had abnormal and decreased cranial/nerves, sensation, and coordination, had abnormal inspection/palpation/motion/stability/strength, abnormal digits/nails, and abnormal gait/station. (AR 1248, 1249.) On April 30, 2015, Plaintiff saw Dr. Aw for refills of medications and problems sleeping, and Dr. Aw noted that Plaintiff had no assistive device, ambulated without assistance, and had abnormal digits/nails. (AR 1246.)

On June 15, 2015, when Plaintiff was hospitalized at St. Agnes after taking a handful of pills, he had normal range of motion, normal strength, normal tenderness, no focal neurological deficit, normal sensory, normal motor, normal coordination, and normal gait. (AR 910.) However, he did have slurred speech. (AR 910.)

On June 17, 2015, Plaintiff saw Dr. Aw for a follow-up from his overdose and Dr. Aw noted that Plaintiff had no assistive device, ambulated without assistance, and had abnormal digits/nails. (AR 1243.)

On July 6, 2015, when Plaintiff was admitted to CRMC with an altered mental state, a physical examination revealed that his cranial nerves are grossly intact and that he has normal sensory and motor, but rapid and pressured speech. (AR 1080.) On July 7, 2015, he had a CT scan of his head that revealed an old right cerebral infarct with associated encephalomalacia and no definite acute intracranial mass or bleed. (AR 1069.) On July 8, 2015, Plaintiff reported muscle tension especially in his right hand, and then he stated that he had left hand spasm and back pain. (AR 1257, 1258.) On July 11, 2015, Plaintiff did not complain of any musculoskeletal or neurological issues and the physical examination revealed normal range of motion and that he is alert and oriented to person, place, and time. (AR 1055-1056.)

On September 22, 2015, while Plaintiff was at CRMC for a respiratory productive cough, he reported "no TIA or stroke symptoms" and he was negative for musculoskeletal issues. (AR 1224.) He had normal neurological strength and normal range of motion in his extremities on September 22, 2015, and September 24, 2015. (AR 1215, 1225.)

Plaintiff was admitted to CRMC because of a seizure from November 3, 2015, to November 14, 2015, and the discharge summary indicates that he had normal strength during the neurological examination and normal range of motion when examining his extremities. (AR

1165.)

Plaintiff was admitted to CRMC with healthcare-associated pneumonia from November 20, 2015, to November 26, 2015. (AR 1116-1159.) There is a note that he is normally ambulatory independently without any aids, although he has had a cane to walk after his stroke. (AR 1117, 1122.) On examination, he had normal strength in the neurological examination and could move all limbs and the examination of his extremities revealed normal range of motion. (AR 1119, 1130.)

On December 10, 2015, Plaintiff saw Dr. Aw for a follow-up from his hospitalization for pneumonia and Dr. Aw noted that Plaintiff had no assistive device, ambulated without assistance, and had abnormal digits/nails. (AR 1240.)

Therefore, the Court finds that substantial evidence in the record supports the ALJ's findings that Plaintiff has made a good recovery from his stroke and there is slight residual left-sided weakness which has been factored into the RFC.

4.    The ALJ Provided Clear and Convincing Reasons for the Credibility Finding

As noted, while the ALJ erred in finding that Plaintiff's desire to look for work warranted an adverse credibility finding, any such error is harmless as the ALJ provided other clear and convincing reasons for the adverse credibility finding. These reasons included Plaintiff's inconsistent statements regarding the dates that he used drugs and alcohol and the fact that Plaintiff has made a good recovery from his stroke with only slight residual left-sided weakness that has been factored into the RFC. See McLeod v. Astrue, 640 F.3d 881, 888 (9th Cir. 2011). Accordingly, the Court finds that any error in the looking for work finding is harmless and the ALJ provided clear and convincing reasons that are supported by substantial evidence in the record to find Plaintiff's testimony only partially credible.

**V.**

**CONCLUSION AND ORDER**

Based on the foregoing, the Court finds that the ALJ did not err in evaluating Dr. Lynch's opinion and finding Plaintiff's testimony partially credible.

Accordingly, IT IS HEREBY ORDERED that Plaintiff's appeal from the decision of the

Commissioner of Social Security is DENIED. It is FURTHER ORDERED that judgment be entered in favor of Defendant Commissioner of Social Security and against Plaintiff Olin Scott Anderson. The Clerk of the Court is directed to CLOSE this action.

IT IS SO ORDERED.

Dated:  __**December 14, 2017**__

_____
UNITED STATES MAGISTRATE JUDGE